Christopher Paul Kailani Medeiros (SBN 319418)
ABA IMMIGRATION JUSTICE PROJECT
2727 Camino Del Rio S. #320
San Diego, CA 92108
Tel: 619-255-8815
Fax: 619-255-8792
christopher.medeiros@abaijp.org

Attorney for Petitioner

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINIDAD BENAVIDEZ-LEÓN,<br><br>　　　　　　　　　　Petitioner,<br><br>v.<br><br>WILLIAM BARR, Attorney General of the United States; CHAD WOLF, Acting Secretary of the United States Department of Homeland Security; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement; GREGORY ARCHAMBAULT, Field Office Director, United States Immigration and Customs Enforcement, JAMES DOBSON, Assistant Field Office Director, Immigration and Customs Enforcement; CHRISTOPHER J. LAROSE, Senior Warden, Otay Mesa Detention Center,<br><br>　　　　　　　　　　Respondents. | Case No.: '20 CV0795 GPC NLS<br><br>Agency No. 019-805-705<br><br>**PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TO BE LOW-NUMBERED TO CASE NO. 20-CV-750-H-MDD]** |

# INTRODUCTION

1. Trinidad Benavidez León ("Mr. Benavidez") petitions this Court for a writ of habeas corpus to remedy his unlawful detention. *See* 28 U.S.C. § 2241.

2. Mr. Benavidez is a 66-year-old citizen of Mexico who has come to the United States seeking protection. He has multiple diagnosed mental disorders, and has been found incompetent to represent himself in immigration court. He is currently detained at the Otay Mesa Detention Center (OMDC) in San Diego, California.

3. Because of this, his life is in danger. As of April 24, 2020, 111 OMDC detainees and 25 people who work at OMDC have tested positive for the disease COVID-19. This number promises to climb further. And as COVID-19 closes in on him in detention, Mr. Benavidez is particularly vulnerable to the disease because of his age and medical history. His mental disorders, moreover, make it unlikely that he will be able to adhere to best practices—such as frequent hand-washing, and refraining from touching his face—for limiting their risk of infection.

4. Under these unique and dire circumstances, due process does not permit the Respondents to detain the Mr. Benavidez in the face of these risks to his health, and ultimately, life. The Court should therefore order him released.

# PARTIES

5. Mr. Benavidez is a 66-year-old citizen of Mexico. He is currently detained at OMDC. He has been diagnosed with multiple mental disorders, as well as hepatitis B, hepatitis C, and elevated blood pressure. He is a member of the plaintiff class that the Central District of California certified in *Franco-Gonzalez v. Holder*. *See* No. CV–10–02211 DMG (DTBx), 2014 WL 5475097, at *12 (C.D. Cal. Oct. 29, 2014) (defining a class of "[a]ll individuals who are or will be in DHS custody for immigration proceedings in California, Arizona, and Washington who have been identified by or to medical personnel, DHS, or an Immigration Judge, as having a serious mental disorder or defect that may

render them incompetent to represent themselves in immigration proceedings, and who presently lack counsel in their immigration proceedings.").

6. Respondent William Barr is the Attorney General of the United States. He is responsible for implementing and enforcing a portion of the immigration laws of the United States. *See* 8 U.S.C. § 1103(g)(1). Some of this authority is delegated to the Executive Office for Immigration Review, the agency to which the immigration courts and Board of Immigration Appeals (BIA) belong. *See* 8 C.F.R. § 1003.0(a). Attorney General Barr is a legal custodian of Mr. Benavidez. He is sued in his official capacity.

7. Respondent Chad Wolf is the Acting Secretary of Homeland Security. He is responsible for enforcing another portion of the immigration laws of the United States, *see* 8 U.S.C. § 1103(a)(1), including those concerning the detention and removal of noncitizens, *see* 6 U.S.C. § 251(2). Thus, Secretary Wolf is a legal custodian of Mr. Benavidez. He is sued in his official capacity.

8. Respondent Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement (ICE). DHS is ICE's parent agency. *See* 6 U.S.C. § 113(a)(1)(G); 8 C.F.R. § 1.1. Deputy Director Albence is responsible for ICE's policies, practices, and procedures, including those that pertain to the detention of noncitizens. Thus, Deputy Director Albence a legal custodian of Mr. Benavidez. He is sued in his official capacity.

9. Respondent Gregory Archambault is the Field Director of ICE's San Diego Field Office. The San Diego Field Office is responsible for ICE's detention operations at OMDC. Field Director Archambault is therefore a legal custodian of Mr. Benavidez. He is sued in his official capacity.

10. Respondent James Dobson is the Assistant Field Director of ICE's San Diego Field Office. He is the officer-in-charge at OMDC, making him a legal custodian of Mr. Benavidez. He is sued in his official capacity

11. Finally, Respondent Christopher J. LaRose is the senior warden of OMDC. He is employed by the private corporation CoreCivic. Warden La Rose is Mr. Benavidez's immediate physical custodian. He is sued in his official capacity.

## JURISDICTION AND VENUE

12. 28 U.S.C. §§ 1331, 1651, 2241, and Article I, section nine, clause two of the United States Constitution give the Court jurisdiction.

13. Venue is proper in the Southern District of California because Mr. Benavidez is detained here. *See* 28 U.S.C. §§ 1391(e), 2241.

## BACKGROUND

### I. COVID-19

14. We are amid a pandemic and national emergency.[1] As of April 28, 2020, 1,002,498 people in the United States have tested positive for Coronavirus Disease 2019, or COVID-19, and 57,266 have died.[2] The director of the National Institute of Allergy and Infectious Diseases has warned that—given COVID-19's precipitous spread—the disease may ultimately claim the lives of between 100,000 and 200,000 people in the United States.[3]

---

[1] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease* (COVID-19) Outbreak, The White House (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/; *WHO Director-General's opening remarks at the media briefing on COVID-19*, World Health Organization (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] *Coronavirus COVID-10 Global Cases*, John Hopkins University & Medicine Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited April 28, 2020).

[3] Bobby Allyn, *Fauci Estimates That 100,000 To 200,000 Americans Could Die From The Coronavirus*, NPR (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus.

15. COVID-19 is a respiratory illness.[4] The virus that causes COVID-19 spreads "between people who are in close contact with one another (within about 6 feet) through respiratory droplets produced when an infected person coughs or sneezes."[5] According to the Centers for Disease Control and Prevention (CDC), it may also "be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes."[6] Research indicates that the virus that causes COVID-19 can remain "viable and infectious in aerosols for hours and on surfaces up to days."[7] Cases that are "severe"—about 16% of total cases—can result in "pneumonia with respiratory failure, septic shock, multi organ failure, and even death." ECF 1-2 at 16. According to the CDC's director, up to 25% people with COVID-19 are asymptomatic, but still capable of transmitting the disease.[8]

16. The CDC also warns that older adults are particularly at risk of developing more serious complications from COVID-19.[9] Indeed, the CDC reports that eight out of ten reported deaths from COVID-19 in the United States have been in adults age 65 or older.[10] People with "underlying medical conditions, particularly if not well controlled"—

---

[4] *What you need to know about coronavirus disease 2019 (COVID-19)*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last visited Apr. 3, 2020).

[5] *Id.*

[6] *Id.*

[7] Neeltje van Doremalen, et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1* (letter to the editor), New Eng. J. of Med. (Mar. 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973?query=RP.

[8] Sam Whitehead, *CDC Director on Models for the Months to Come: 'This Virus is Going to be with Us,'* NPR (Mar. 31, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us.

[9] *Coronavirus Disease 2019 (COVID-19): Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Apr. 10, 2020).

[10] *Id.*

including people who are immunocompromised—are, according to the CDC, also especially vulnerable to COVID-19.[11]

17. The CDC has issued numerous recommendations to stem the spread of COVID-19. These include avoiding coming within six feet of other people, frequent hand washing with either soap and water or a hand sanitizer containing at least 60% alcohol, covering one's face while in public, and "stay[ing] home as much as possible."[12]

## II. COVID-19's uniquely lethal threat to people in ICE custody

18. Against this backdrop, people deprived of their liberty—for example, in immigration detention centers—are especially vulnerable. This is because detention centers "are designed to maximize control of the incarcerated population, not to minimize disease transmission or to efficiently deliver health care."[13] An open letter to ICE signed by over 3,000 medical professionals warns that, "[w]ith a mortality rate 10 times greater than the seasonal flu and a higher R0 (the average number of individuals who can contract the disease from a single infected person) than Ebola, an outbreak of COVID-19 in immigration detention facilities would be devastating."[14]

19. Two doctors currently serving as medical subject matter experts for DHS's Office of Civil Rights and Civil Liberties echoed that sentiment in a March 19, 2020

---

[11] *Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Apr. 20, 2020).

[12] *How to Protect Yourself & Others*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 20, 2020).

[13] Open Letter to ICE From Medical Professionals Regarding COVID-19, *available at* https://docs.google.com/document/d/1eNyNmy-622OjVILFSwgypITPK0eAt5yLgSkS_7_0vv8/edit (last visited Apr. 20, 2020); *see* J Edward Moreno, *Over 3,000 medical professionals urge ICE to release detainees amid coronavirus pandemic*, The Hill (Mar. 19, 2020), https://thehill.com/policy/healthcare/488491-over-3000-medical-professionals-urge-ice-to-release-detainees-amid.

[14] *See* Open Letter, *supra* note 13.

whistleblower letter to Congress.[15] They warned of a "tinderbox scenario," in which—because "social distancing is an oxymoron in congregate settings"—a rapid outbreak of COVID-19 occurs in a detention center, which in turn overwhelms local hospital systems risks infecting hospital staff.[16] In that scenario, "many people from the detention center *and the community* would die unnecessarily for want of a ventilator."[17]

20. John Sandweg, former Acting Director of ICE, has similarly observed that the very nature of detention makes social distancing impossible. Thus, he has concluded that "preventing the virus from being introduced into [immigration detention centers] is impossible."[18]

21. Notably, even before the pandemic, medical experts and DHS's own Inspector General had criticized ICE's provision of medical attention to detainees, including at OMDC.[19]

22. Unsurprisingly, many noncitizens in ICE custody have brought legal challenges to their continued detention during the pandemic. The scores of expert declarations submitted in many of these cases provide further support for the consensus

---

[15] *See* Letter from Dr. Scott Allen and Dr. Josiah Rich, to House Comm. on Homeland Sec., Mar. 19, 2020, *available at* https://www.documentcloud.org/documents/6816336-032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.html#document/p4/a557238; Catherine Shoichet, *Doctors Warn of "Tinderbox Scenario" If Coronavirus Spreads in ICE Detention*, CNN.com, Mar. 20, 2020, https://www.cnn.com/2020/03/20/health/doctorsice-detention-coronavirus/index.html.

[16] *Id.*

[17] *Id.*

[18] John Sandweg, *I Used to Run ICE. We Need to Release the Nonviolent Detainees.* The Atlantic (Mar. 22, 2020), https://www.theatlantic.com/ideas/archive/2020/03/release-ice-detainees/608536/.

[19] *See* Cameron P Quinn & Marc Pachon, *Memorandum re: ICE Health Service Corps (IHSC) Medical/Mental Health Care and Oversight Complaints* (Mar 20, 2019), *available at* https://www.documentcloud.org/documents/6575024-ICE-Whistleblower-Report.html (last visited Apr. 6, 2020); Joe Penney, *How Medical Negligence at the US Border Killed an Immigrant Father*, The Nation (Feb. 25, 2020), https://www.thenation.com/article/world/ice-death-negligence/; Maya Srikrishnan, *Documents Allege Serious Medical Neglect Inside Otay Mesa Detention Center*, Voice of San Diego (Aug. 13, 2019), https://www.voiceofsandiego.org/topics/news/documents-allege-serious-medical-neglect-inside-otay-mesa-detention-center/.

that detainees currently find themselves in a situation of extreme danger. *See, e.g.*, Declaration of Joseph J. Amon, Ph.D MSPH, *Sagastume v. Archambeault*, No. 20-cv-0658-LAB-MSB (S.D. Cal. Apr. 3, 2020), ECF No. 2-7 ("Amon Dec'l"); Declaration of Dr. Peter Schrarf, *Mons v. McAleenan*, No. 19-cv-01593 (D.D.C. Mar. 31, 2020), ECF No. 61-13; Declaration of Homer Venters, *Fraihat v. ICE*, No. 19-cv-01546-JGB-SHK (C.D. Cal. Mar. 24, 2020), ECF No. 81-11 ("Venters Dec'l"); Declaration of Dr. Jaimie Meyer, *Velesaca v. Decker*, No. 20-cv-1803 (AKH), (S.D.N.Y Mar. 16, 2020), ECF No. 42; Declaration of Dr. Marc Stern, *Dawson v. Asher*, No. 20-cv-00409-JLR-MAT (W.D. Wash. Mar. 16, 2020), ECF No. 6.

23. Meanwhile, ICE's response to the pandemic has not been proportionate to the threat that COVID-19 poses to the people in its custody.[20] As the Central District of California has highlighted, Dr. Homer Venters has "note[d] several discrepancies and gaps in ICE's global response, including that it":

- Does not require symptomatic detainees be given a mask and placed in medical isolation;
- Does not mandate nose and mouth coverings for those who cannot engage in social distancing;
- Does not present a plan for isolation when the number of people needing to be isolated exceeds existing isolation rooms or cells;
- Does not limit transportation of detainees;
- Does no identify what precautions should be taken to protect people with risk factors in ICE custody;
- Fails to include certain risk factors identified by the CDC and which [Field Office Directors] and their staff may not be aware;
- Delegates medical screening for custody review to [Field Office Directors] and staff who are not medical professionals, and advises them to check with medical professionals only after the fact;
- Does not urgently command risk factor screening measures, but merely requests them, without any timeline;
- Fails to account for the fact that detained populations are 10-15 years more progressed than chronological age;

---

[20] *ICE Guidance on COVID-19*, ICE, https://www.ice.gov/coronavirus (last visited Apr. 20, 2020).

- Does not ensure risk factors reflect evolving data and science;
- Does not include nationwide surveillance, coordination, or communication measures.

*Fraihat*, No. 19-cv-01546-JGB-SHKx (C.D. Cal. Apr. 20, 2020), ECF No. 132 at 12 (citing Venters Dec'l ¶¶ 3-4).

24. As of April 17, 2020, ICE had only tested approximately 1% of all detainees in its custody for COVID-19; 124 tests—roughly one third of all tests administered—have been back positive.[21] And evidence suggests that many more ICE detainees have been infected. For example, 44 people whom ICE deported to Guatemala on a single flight last week have since tested positive for COVID-19.[22] Three people deported to Haiti via the same flight have also tested positive during a post-deportation quarantine.[23]

25. COVID-19's alarming spread in state and federal prisons illustrates the threat that the disease poses in carceral settings, and foretells what could happen in ICE detention centers if the spread of COVID-19 continues unabated. At the Marion Correctional Institution in Ohio—where prison officials have instituted universal testing—73% of all inmates have tested positive.[24] Seven inmates have already died of COVID-19 amid an outbreak at Federal Correctional Institution Oakdale, in Louisiana.[25] And COVID-19 has

---

[21] Tanvi Misra, *ICE's COVID-19 test figures hint at health crisis in detention*, Roll Call (Apr. 17, 2020), https://www.rollcall.com/2020/04/17/ices-covid-19-test-figures-hint-at-health-crisis-in-detention/.

[22] Natalie Gallón, *44 migrants on one US deportation flight tested positive for coronavirus*, CNN.com (Apr. 17, 2020), https://www.cnn.com/2020/04/17/americas/us-migrants-guatemala-coronavirus/index.html.

[23] *Haitian source says three deportees from U.S. have coronavirus*, Reuters (Apr. 20, 2020), https://www.reuters.com/article/us-health-coronavirus-haiti-deportation/haitian-source-says-three-deportees-from-u-s-have-coronavirus-idUSKBN222217.

[24] Bill Chappell, *73% Of Inmates At An Ohio Prison Test Positive For Coronavirus*, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

[25] *Seventh inmate death from COVID-19 reported at FCI Oakdale I*, KALB (Apr. 15, 2020), https://www.kalb.com/content/news/Seventh-inmate-death-from-COVID-19-reported-at-FCI-Oakdale-I-569679741.html.

similarly overwhelmed state correctional facilities in Cook County Illinois, where it has claimed the lives for four detainees and one correctional officer.[26]

### III. COVID-19 at OMDC

26. COVID-19 has taken hold at OMDC. As of April 25, 2020, 111 OMDC detainees and 25 people who work at OMDC have tested positive for COVID-19.[27] Meanwhile, OMDC has not taken sufficient measures to mitigate the threat that this outbreak poses to detainees. For example, despite the risk of asymptomatic transmission, staff and vendors continue to enter OMDC subject only to a body-temperature screening.[28] And, in "cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period"[29]—a measure that creates a substantial risk of the disease's spread to other detainees within a "cohort."

27. Reports have emerged that, on April 9, 2020, OMDC employees refused to distribute facemasks to a "pod" of detainees unless the detainees signed liability waivers.[30]

---

[26] Andy Grimm, *Corrections officer at Cook County Jail died of COVID-19, family says*, Chicago Sun Times (Apr. 20, 2020), https://chicago.suntimes.com/2020/4/20/21228163/cook-county-jail-guard-dies-covid-19-family-says-sheila-rivera.

[27] Kate Morrissey, *Advocates with mask donation turned away from San Diego immigration detention center*, L.A. Times (Apr. 25, 2020), https://www.latimes.com/california/story/2020-04-25/advocates-with-mask-donation-turned-away-from-san-diego-immigration-detention-center.

[28] Declaration of Captain Philip Farabaugh, MD, *Habibi v. Barr*, No 20-cv-618-BAS-RBB (S.D. Cal. 2020), ECF No. 12-2 at 5.

[29] *Id.* at 3.

[30] *See* Kate Morrissey, *Detainees at Otay Mesa Detention Center were offered masks, but only if they signed contracts*, San Diego Union-Tribune (Apr. 10, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-04-10/otay-mesa-detention-center-gets-masks-but-asks-detainees-to-sign-contract-first.

A declaration filed in litigation in his Court corroborates this account, and also reports that detainees do not have reliable access to hand sanitizer.[31]

28. OMDC detainees have begun a hunger strike in protest of OMDC staff's failure to provide detainees with replacement masks.[32] One detainee participating in the hunger strike has been quoted as decrying that "sick detainees in his pod are being told to gargle saltwater, aren't being tested for COVID-19, and are sent back to be with the rest of the pod."[33] And, according to that detainee, OMDC staff have "have walked around the facility without masks or gloves."[34] A declaration filed in *Fraihat* corroborates that account of conditions at OMDC:

> As of March 20, 2020, [legal-service providers] observed [OMDC] employees shaking hands, patting shoulders, and working in close proximity to each other. Attorneys were allowed to enter the facility for non-contact video teleconference visits, without screening procedures. Visiting attorneys did not have their temperature taken, and were not asked if they had COVID-19 symptoms. Telephones were not cleaned prior to the visit. Detainees reported cleaning pods and laundering clothes without protective gear other than gloves.

*See* No. 19-cv-01546-JGB-SHK (C.D. Cal. Apr. 4, 2020), ECF No. 132 at 15 (internal citations omitted).

IV. **Mr. Benavidez**

29. Mr. Benavidez is a 66-year-old citizen of Mexico. He has spent his life living between Mexico and the United States. He has experienced traumatic brain injuries, and been diagnosed with: (1) major depressive disorder; (2) schizophrenia; (3) major

---

[31] Declaration of Anna M. Hysell, *Sagastume v. Archambeault*, No. 20-cv-0658-LAB-MSB (S.D. Cal. 2020), ECF No. 26-1.

[32] *See* Max Rivlin-Nadler, *Immigration Detainees Launch Hunger Strike As Outbreak Grows At Otay Mesa Detention Center*, KPBS (Apr. 17, 2020), https://www.kpbs.org/news/2020/apr/17/immigration-detainees-launch-hunger-strike-respons/?1236654.

[33] *Id.*

[34] *Id.*

neurocognitive disorder, and; (4) an "other specified trauma- and [stressor-related disorder]." Ex. J at 3.[35] He also has hepatitis B, hepatitis C, and elevated blood pressure. *Benavidez v. Barr*, No. 20-cv-750-H-MDD (S.D. Cal. filed Apr. 21, 2020), ECF No. 5-3.

30. Mr. Benavidez has a criminal record from when he was younger. *See* Ex. M at 50-52 (criminal history chart), 53-65 (RAP sheet). But Mr. Benavidez has not been arrested since 2009, and has not been convicted of a criminal offense since 2002. Ex. M at 52, 64-65. His last conviction resulting in a term of imprisonment was in 1998, when he was sentenced to 32 months for possession of a controlled substance. *Id.* at 52, 64.

31. Mr. Benavidez has sought the protection of United States because he fears for his life in Mexico. After he applied for admission to the United States at the San Ysidro Port of Entry, DHS initiated removal proceedings against him, and filed a notice of *Franco-Gonzalez* class membership in the Otay Mesa Immigration Court. Ex. G ¶ 3. After an Immigration Judge (IJ) found him not competent, he was appointed counsel in his removal proceedings. *Id.* ¶ 3; *see Franco-Gonzalez*, 2014 WL 3674492, at *20 (C.D. Cal. Apr. 23, 2013). He is currently detained at OMDC. Ex. G ¶ 2.

32. Through his appointed counsel, Mr. Benavidez applied for deferral of removal under the United Nations Convention against Torture (CAT). Ex. G ¶ 5; *see* 8 C.F.R. § 1208.17. An IJ denied his application and ordered him removed to Mexico. Ex. G ¶ 5. The BIA affirmed that decision. *Id.* ¶ 6. Mr. Benavidez has filed a petition for review of the BIA's decision in the Ninth Circuit, and moved for a stay of his removal. *See Benavidez v. Barr*, No. 20-70931 (9th Cir. 2020), ECF No. 1. The Ninth Circuit has preliminarily stayed his removal pending a decision on his stay motion. *Id.*

---

[35] Citations to exhibits in this petition refer to the exhibits in support of the petition for a writ of habeas corpus in *Benavidez v. Barr*, No. 20-cv-750-H-MDD (S.D. Cal. filed Apr. 21, 2020). That petition was brought by Mr. Benavidez and a co-petitioner. *See id.* at ECF No. 1. In setting a briefing schedule on the petitioners' ex parte application for a temporary restraining order, the Court indicated that the petitioners should have filed separate habeas petitions, and therefore ordered them to do so. *Id.*, ECF No. 10 at 3, 6. Mr. Benavidez now brings this petition to comply with that order.

33. After six months' detention, Mr. Benavidez became eligible for a bond hearing before an IJ. *See Franco-Gonzalez*, 2014 WL 3674492, at *13. That hearing took place on June 5, 2019. Ex. I at 4. The IJ denied bond, finding Mr. Benavidez to be a danger to the community in light of his criminal history. *Id.* at 4-7. The BIA dismissed Mr. Benavidez's appeal of that decision. Ex. I at 5.

34. In the expert opinion of Mr. Benavidez's neuropsychological evaluator, Dr. Julia Kuck, Mr. Benavidez's current detention at OMDC "posts an imminent risk of harm to him." Ex. J at 9; *see also* Ex. F at 10-14 (Dr. Kuck's CV). This is so, according to Dr. Kuck, because Mr. Benavidez has experienced traumatic brain injuries (TBI). As Dr. Kuck's expert declaration sets out in detail, TBI—whether minimal or severe—"leads to immune suppression and infection." *Id.* at 7. That Mr. Benavidez has hepatitis and suffers from hypertension only compounds his risk. *Id.*

35. What is more, according to Dr. Kuck, Mr. Benavidez "lacks the reasoning capacity and memory skills to adhere to COVID-19 safety requirements of social distancing, hygiene maintenance, and mask adherence unless he is monitored in a 1:1 segregation cell, which is a punitive behavioral measure." *Id.* at 8. This further intensifies his risk of contracting COVID-19 at OMDC, and fortifies Dr. Kuck's conclusion that he is at risk while detained there. *Id.* at 9.

36. On April 7, 2020, ICE Enforcement and Removal Operations (ERO) Deportation Officer Alex Ontiveros contacted counsel for Mr. Benavidez, informing them that Mr. Benavidez was to be released from detention. Ex. A ¶ 12; Ex. G ¶ 7. Before Mr. Benavidez was released, however, ERO management—according to Officer Ontiveros—overrode the decision to release Mr. Benavidez. *Id.* Thus, Mr. Benavidez remains detained at OMDC. Ex. G ¶ 8.

### V. Post-release plan for Mr. Benavidez

37. If released from OMDC, the ABA Immigration Justice Project (IJP) would seek to have Mr. Benavidez stay at the Jewish Family Services Migrant Family Shelter in San Diego ("the Shelter"). *See* Ex. L ¶ 2. The Shelter is prepared to accept "individuals released from ICE custody at [OMDC], including individuals who are at heightened medical vulnerability, who do not have a place where they could go to be isolated within CDC standards." Ex. K at 1. So too does the shelter have "medical staff on site that can address immediate medical needs." *Id.* Should it become necessary, the Shelter is also able to arrange for releasees to be "housed in isolation at a San Diego County approved hotel where isolation is possible." *Id.* at 2. As of April 19, 2020, the Shelter was well below its maximum capacity, and so IJP does not anticipate any difficulties in securing space for Mr. Benavidez. *Id.* at 1. But should the need arise, IJP staff is prepared to locate alternative housing arrangements for him. Ex. L ¶ 3.

38. Once Mr. Benavidez is released from OMDC, IJP will work to secure him medium-to-long term housing. Ex. L ¶ 5.

39. IJP has identified various organizations that can provide the Mr. Benavidez with free or low-cost healthcare and mental-health services post-release. *Id.* ¶ 6. And IJP staff would also coordinate transportation for any future ICE check-ins or court hearings that he may have. *Id.*

### ARGUMENT

40. Because he is in DHS's custody for immigration-related reasons—as opposed to serving out a sentence—Mr. Benavidez is a civil detainee. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). For that reason, the Fifth Amendment's due process clause, and not the Eight Amendment, provides the floor for how the government may treat him while detained. *See King v. City of L.A.*, 885 F.3d 548, 556-57 (9th Cir. 2018). Due process requires more of the government than the Eight Amendment. For, while the Eight Amendment requires only that punishment be neither cruel nor unusual, the due process

clause forbids the punishment of civil detainees altogether. *Jones v. Blanas*, 393 F.3d 918, 931-32 (9th Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979)). And if a condition of detention "is not reasonably related to a legitimate goal . . . a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon [civil] detainees." *Bell*, 441 U.S. at 539; *see also Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004) (holding that conditions are punitive where they are "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods").

41. Of direct relevance to this petition, the Supreme Court has recognized that the Eight Amendment forbids "ignor[ing] a condition of confinement that is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). And it has likewise set forth that when the government fails to provide for civil detainees' "basic human needs—*e.g.* food, clothing, medical care, and reasonable safety— it transgresses . . . the Eight Amendment and the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

42. Under this rubric, the Mr. Benavidez's continued detention while a COVID-19 outbreak is underway at OMDC violates due process. Mr. Benavidez—because of his advanced age, TBI-compromised immune system, elevated blood pressure, and hepatitis—is in extreme danger of suffering complications if he contracts COVID-19. And—compounding his already-increased likelihood of contracting the disease because meaningful social distancing is not possible at OMDC—his cognitive impairments present an obstacle to him effectively adhering to personal hygienic protocols (such as frequent hand-washing, and avoiding face-touching) that would reduce his risk of contagion. Due process does not permit the Respondents to continue to detain Mr. Benavidez in the face of such an elevated risk to his physical health. *See Helling*, 509 U.S. at 33; *DeShaney*, 489 U.S. at 199-200.

43. Nor is Mr. Benavidez's continued detention "reasonably related" to a legitimate goal. *Bell*, 441 U.S. at 539. He is detained pending the Ninth Circuit's resolution

of his petition for review of his administratively final removal order. Thus, the purpose of his detention is to ensure his presence at any future immigration court proceedings (in the event that the Ninth Circuit remands) or to facilitate the execution of his removal order (in the event that the Ninth Circuit dismisses his petition for review). But under the circumstances, his continued detention puts his life in danger, making it grossly disproportionate to its objective. Simply put, because violations of immigration law are not capital offenses, keeping Mr. Benavidez at OMDC is plainly "excessive in relation to [the] purpose" of his civil detention. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015); *see also Fraihat*, No. 19-cv-01546-JGB-SHK (C.D. Cal. Apr. 20, 2020), ECF No. 132 at 34 ("Participation in immigration proceedings is not possible for those who are sick or dying, and is impossible for those who are dead. Another purpose of detention, public safety, is not advanced by delay. Plaintiffs establish that public safety as a whole is seriously diminished by facility outbreaks, which further tax community health resources.").

44. That Mr. Benavidez has a criminal record changes nothing. He has completed all of his sentences, and is now a civil detainee. While detained at OMDC amid an outbreak, he faces an intolerable risk of contracting—and ultimately dying from—COVID-19. His criminal history, then, cannot justify his continued detention. Indeed, forcing his to remain detained in light of his criminal record would make his detention definitionally punitive. And due process does not allow that. *See Bell*, 441 U.S. at 535-36.

45. Mr. Benavidez's continued detention also violates due process in the additional sense that it amounts to impermissible medical indifference. *See Gordon v. Cty. of Orange*, 888 F.3d. 1118, 1125 (9th Cir. 2018); *Castro v. City of Los Angeles*, 833 F.3d 1060, 1070-71 (9th Cir. 2016). Indeed, the district court in *Fraihat* has concluded that ICE's COVID-19-related protocols likely constitute medical indifference towards vulnerable detainees such as Mr. Benavidez.[36] *See* 19-cv-01546-JGB-SHK (C.D. Cal. Apr. 20, 2020),

---

[36] The district court in *Fraihat* has ordered the government to idenfify ICE detainees with certain risk factors and make "timely custody determinations" for those detainees. No. 19-cv-01546-JGB-SHK

1  ECF No. 132 at 33 ("[T]he dangerous conditions to which detainees are subjected can be
2  laid at Defendants' doorstep.").

3       46.    This Court has the authority to order Mr. Benavidez released to remedy his
4  unlawful detention. *See* 28 U.S.C. § 2241; *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see*
5  *also Judalang v. Chertoff*, 562 F.Supp.2d 1119, 1127 (S.D. Cal. 2008) (ordering released
6  a detainee in ICE custody whose continued detention violated due process). It would hardly
7  be the first to reach this conclusion in the context of a medically vulnerable detainee in ICE
8  custody during the COVID-19 pandemic. *See*, *e.g.*, *Perez-Cruz v. Barr*, No. 20-cv-668
9  (C.D. Cal. Apr. 3, 2020); *Thakker v. Doll*, No. 20-cv-00480, (M.D. Pa. Mar. 31, 2020),
10 ECF No. 47; *Fraihat v. Wolf*, No. 20-cv-00590-TJH (C.D. Cal. Mar. 30, 2020); *Castillo v.*
11 *Barr*, No. 20-cv-00605, 2020 WL 1502864, at *6 (C.D.. Cal. Mar. 27, 2020); *Coronel v.*
12 *Decker*, No. 20-cv-2472, 2020 WL 1487274, at *10 (S.D.N.Y. Mar. 27, 2020); *Basank v.*
13 *Decker*, No. 20-Civ.-2518, 2020 WL 1481503, at *7 (S.D.N.Y. Mar. 26, 2020); *Calderon*
14 *Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass. Mar. 26, 2020), ECF No. 507. Nor would
15 it be the first to order released a detainee with a criminal history who is especially
16 vulnerable to COVID-19. *See*, *e.g.*, *Bent v. Barr*, No. 19-cv-6123, 2020 WL 1812850 (N.D.
17 Cal. Apr. 9, 2020); *Bogle v. Barr*, No. 20-cv-650 (C.D. Cal. Apr. 3, 2020); *Hernandez v.*
18 *Wolf*, No 20-cv-00617 (C.D. Cal. Apr. 1, 2020); *Fraihat*, No. 20-cv-00590-TJH (C.D. Cal.
19 Mar. 30, 2020).

---

27 (C.D. Cal. Apr. 20, 2020), ECF No. 132 at 38. The district court was clear that the government shall
28 undertake those steps regardless of whether a detainee has also petitioned for habeas relief. *Id.* Here, Mr. Benavidez exhibits several of the relevant risk factors. *See id.* at 21 n.20.

# VERIFICATION

56. I, Christopher Paul Kailani Medeiros, verify that the facts contained in this petition are true and correct.

Respectfully submitted,

Dated: April 28, 2020

s/ *Christopher Paul Kailani Medeiros*
Christopher Paul Kailani Medeiros
Attorney for Mr. Benavidez